UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
:
**MECCA JONES**,
:
Plaintiff,
:
: **MEMORANDUM DECISION**
: **AND ORDER**
– against –
: 17-cv-06460 (AMD) (SMG)
:
**NEW YORK CITY TRANSIT AUTHORITY**,
:
Defendant.
:
:
:
------------------------------------------------------------- X
**ANN M. DONNELLY**, United States District Judge:

## INTRODUCTION

The plaintiff filed this action on November 6, 2017, alleging violations of the Americans

with Disabilities Act of 1990, the New York City Human Rights Law and the New York State

Human Rights Law by her former employer, the New York City Transit Authority. (ECF No. 1.)

On July 8, 2019, the defendant moved for summary judgment (ECF No. 32), and on August 5,

2019, the plaintiff cross-moved for partial summary judgment (ECF No. 33). For the reasons

that follow, I grant the defendant's motion and deny the plaintiff's motion.

## BACKGROUND[1]

1. *The Plaintiff's Employment at NYCTA*

On December 26, 2016, the New York City Transit Authority ("NYCTA") appointed the

plaintiff to a train conductor position, subject to successful completion of a one-year

---

[1] Unless otherwise noted, the following facts are undisputed and are based on my review of the record.
As to each motion, I construe the facts in the light most favorable to the non-moving party. *Capobianco
v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2005).

probatory term.[2]  (ECF No. 35, Pl.'s 56.1 Counter-Statement ("Pl.'s 56.1 Counter") ¶ 2; Jones

Dep. 57:3-13.)  The plaintiff was terminated less than a month later.  (Pl.'s 56.1 Counter ¶ 37;

ECF No. 37-10.)

### 2. Job Responsibilities and Probationary Employment

Probationary conductors begin their employment with a training period, which lasts

several weeks and includes both classroom and field instruction.  (Pl.'s 56.1 Counter ¶ 11;

Thomas Dep. 17:19-18:24; Young Dep. 13:24-15:24.)  Probationary conductors are assigned

either to the "A Division" or the "B Division" based on their file numbers.  (Young Dep. 13:24-

14:25.)  According to Superintendent Leonard Young, once someone is assigned to a division,

this is "written in stone;" he cannot move employees from one division to another after this point

because of "a union issue."  (*Id.* at 54:10-23.)

In order to complete training successfully, a probationary conductor must demonstrate

that she can climb from the track into and out of a train car on every model train in the division.

(Pl.'s 56.1 Counter ¶ 15; Young Dep. 29:19-30:17.)  Superintendent Young and Training Service

Supervisors (TSS) Kenneth Daughtry and Yolanda Thomas testified that conductors must be able

to enter and exit the train in various situations, including emergency evacuations, putting a train

in the storage yard and "retraining."  (Young Dep. 31:21-33:9; Daughtry Dep. 15:5-17:4, 22:2-

23:12; Thomas Dep. 13:21-17:18.)

---

[2] On a motion for summary judgment, the Court's consideration is limited to factual material that would
be admissible in evidence at trial.  *Local Unions 20 v. United Bhd. of Carpenters and Joiners of Am.*, 223
F. Supp. 2d 491, 496 (S.D.N.Y. 2002).  Factual allegations that are disputed without a citation to
admissible evidence are deemed admitted, as long as they are also supported by the record.  Local Civ. R.
56.1; *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003).  Factual allegations that are not
disputed are deemed admitted, as long as they are also supported by the record.  *Id.*  I disregard any
arguments in the Rule 56.1 statements.  *Pape v. Dircksen & Talleyrand Inc.*, No. 16-CV-5377, 2019 WL
1435882, at *2 (E.D.N.Y. Feb. 1, 2019), *report and recommendation adopted*, 2019 WL 1441125
(E.D.N.Y. Mar. 31, 2019).

The parties agree that if a probationary conductor cannot perform an essential task during training, the TSS informs the Superintendent. (Pl.'s 56.1 Counter ¶ 18.) Young had never encountered a situation in which a probationary employee identified a disability during training that she had not previously reported, but the protocol was to contact the ADA Unit and "give the person a practical to see if the person can perform the duty that they are currently seeking." (Young Dep. 17:11-23.) NYTCA has not considered changing the training and job requirements for new employees with disabilities; employees must be able to meet the job requirements for safety reasons. (*Id.* at 57:6-58:16.)

After the training period, probationary conductors are assigned to work schedules as "extra-extra," meaning that they do not have regular days off and can be assigned to any shift on any subway line on a daily basis. (Thomas Dep. 12:2-25.)[3] Every six months, train operators select a line, as well as their hours and days off, according to seniority. (Thomas Dep. 36:22-37:20; Daughtry Dep. 16:18-18:22.) However, there is no guarantee that the same train will run on the same line every day. (Thomas Dep. 36:22-37:20; Young Dep. 37:9-24.) Young testified that there would be no way to accommodate a conductor who could not climb onto a particular kind of train, because there is no way to guarantee that the conductor would always be on a specific train or line. (Young Dep. 29:6-21, 31:5-18.)

3. *The Plaintiff's Medical History*

The evidence of the plaintiff's medical history is based only on her testimony and on a brief letter from Dr. Sanjay Sekar dated January 9, 2019, the same day the plaintiff visited the

---

[3] Citing Yolanda Thomas' deposition testimony, the defendant asserts that all probationary conductors are scheduled to work as "extra-extra" pursuant to their labor union contract. (ECF No. 32-1, Def's 56.1 Statement ("Def.'s 56.1") ¶ 13.) The deposition testimony the defendant cites does not discuss the labor union contract, and the union contract is not part of the record. Thomas did, however, testify that all new conductors are assigned to work "extra-extra."

office, two years after her termination and a little more than a year after she filed her lawsuit.

The letter, in its entirety, reads as follows:

> To Whom it May Concern:
> Mecca Jones (DOB: 06/16/1979) is currently a patient at 865 Internal Medicine
> Clinic. She has a history of multiple DVT's [*sic*] in both legs. These DVT's [*sic*]
> can cause pain and swelling of the legs that makes [*sic*] it difficult for her to
> stand, climb and lift her body weight up. Please allow proper precautions for her
> given this diagnosis.

(ECF No. 37-1.) The plaintiff's medical records are not part of the record.

The plaintiff testified that she had a history of Deep Vein Thrombosis ("DVT") (Pl.'s
56.1 Counter ¶ 6; ECF No. 40-5, Def.'s 56.1 Counter-Statement ("Def.'s 56.1 Counter") ¶ 1;
ECF No. 37-1), but had no active clots since December of 2015, had not taken medication for
DVT since early 2016 and did not have DVT at her November 2018 deposition (Pl.'s 56.1
Counter ¶ 6; Jones Dep. 62:22-63:5, 72:12-15). However, the DVT damaged "the strength, the
muscles, and the nerves" in her legs. (Pl.'s 56.1 Counter ¶ 5; Jones Dep. 61:25-62:3.)

The plaintiff has difficulty walking "long distances or on exertion," depending on the
difficulty of the activity; she has to pace herself and cannot walk as fast as other people. (Pl.'s
Counter 56.1 ¶ 8; Jones Dep. 40:16-42:5.)[4] She can walk three to four blocks at a time, and can
continue walking if she rests. (Jones Dep. 63:25-64:12.) The parties dispute the extent of the
plaintiff's limitations; citing the plaintiff's testimony that she sometimes has pain in her knees
when she climbs stairs (Jones Dep. 64:13-65:1), the defendant says that her limitations are
minimal. The plaintiff, on the other hand, cites the supposedly "undisputed allegations" in the
defendant's 56.1 Statement (Pl.'s 56.1 Counter ¶ 9) for the proposition that the plaintiff has

---

[4] Part of the plaintiff's difficulty in this regard is caused by thalassemia, a condition that she does not
allege as part of her disability.

serious limitations.[5]  The plaintiff testified that she had muscle pain and weakness in her legs if she climbed more than one flight of stairs, and when she walked three to four blocks.  (Pl.'s Counter 56.1 ¶ 7; Jones Dep. 63:8-64:22, 68:1-18.)  She would not be able to climb to the top of the Statue of Liberty, but might be able to climb two flights without stopping.  (Pl.'s Counter 56.1 ¶ 8; Jones Dep. 65:9-66:3.)

### 4.  The Plaintiff's Medical Examination

The plaintiff applied to be a train conductor in 2008.  (Jones Dep. 57:14-18, 168:18-169:1.)  In order to take the qualifying exam, she responded to the New York City Department of Citywide Administrative Services' "Notice of Examination," which listed "[s]ome of the physical activities performed by Conductors," including "walking along subway tracks," "stepping over rails" and "ascending and descending from trains and catwalks to roadbeds." (Pl.'s 56.1 Counter ¶ 10; ECF No. 32-11 at 2; Jones Dep. 168:18-169:1.)  The plaintiff took the exam in 2008.  (Jones Dep. 57:14-18, 168:18-169:1.)  She was notified in 2015 or 2016 that should would be considered for the conductor position.  (*Id.* at 57:14-18.)

On October 17, 2016, the plaintiff went for a medical examination at NYCTA's Occupational Health Services ("OHS") Department.  (Pl.'s 56.1 Counter ¶ 21; ECF No. 32-12.) In her OHS Health Questionnaire, the plaintiff denied that she ever had "bone, joint, muscle, ligament, tendon or cartilage problems," "nerve problems" or "muscle weakness/numbness/sensory loss or impairment of reflexes."  (ECF No. 32-12 at 5.)  The plaintiff reported a weight problem—she was 5′9″ and 310 pounds—but denied having any conditions that kept her from "bending," "pulling," "standing," "lifting" or "pushing."  (*Id.* at 3,

---

[5] The plaintiff seems to be referring to the defendant's catalogue of the plaintiff's allegations in its 56.1 Statement.  While not especially helpful, the defendant seems merely to be listing the plaintiff's claims, rather than agreeing that they are true.  In any event, I have reviewed the entire record to determine the extent to which there are factual disputes.

6; ECF No. 32-13 at 2, 9.)  Additionally, she denied that she had any health conditions not listed in the Questionnaire; she cited diabetes as her only current medical problem.  (ECF No. 32-12 at 6.)  According to the OSH records from her visit, the plaintiff affirmed that she had "no other current acute or chronic medical conditions" and that she "walks/exercises w/o adverse."  (ECF No. 32-13 at 8, 9.)

The plaintiff does not deny that she filled out the questionnaire as the defendant describes.  Citing her deposition testimony, she maintains that at a "follow-up" she told a nurse whom she does not identify that she took "Gabepentin for the muscles and nerves in [her] legs from the DVT."  (Pl.'s 56.1 Counter ¶ 26; Jones Dep. 139:16-145:11.)[6]  The nurse, who had asked about nerve damage from diabetes, said "that that wasn't what she was concerned with"— "what she's concerned with is [the plaintiff's] diabetes being under control."  (Jones Dep. 139:16-25, 141:21-142:3.)  The plaintiff was placed on a medical hold pending verification from her doctor that her diabetes was under control.  (*Id.* at 140:9-19.)  The plaintiff provided that verification, and was cleared on October 27, 2016.  (ECF No. 32-14.)

5. *The Plaintiff's Probationary Employment*

The plaintiff began her probationary employment on December 26, 2016.  (Pl.'s 56.1 Counter ¶ 2; Jones Dep. 57:3-13.)  She was supervised by instructors Thomas and Daughtry. (Def.'s 56.1 Counter ¶ 7; Thomas Dep. 19:9-10; Daughtry Dep. 10:5-11.)

The parties do not agree about what, if anything, the plaintiff told her supervisors about her medical condition during her probationary employment.  The plaintiff admitted that she did not tell anyone at the Transit Authority, including Daughtry or Thomas, that she had, or once had, DVT (Jones Dep. 110:13-18, 139:12-15, 146:10-12 ("I never disclosed DVT.")); she

---

[6] This testimony conflicts with the plaintiff's deposition testimony that she had taken no medication for her DVT, other than a form of aspirin, since early 2016.

claimed, however, that she told Daughtry and Thomas that she had "damage" to her legs—that she did not have the leg strength to extend her body to reach the grab bars and needed a better way to climb up and down from the train (*id.* at 110:13-25; 145:12-146:9). She testified that that she told TSS Charles Rodgers, as well as Thomas, Daughtry and Young, that she had weakness and damaged muscles and nerves in her legs. (Jones Dep. (Day 2) 35:7-17.)

Her supervisors testified otherwise. According to Young, the plaintiff never mentioned to him that she had a problem with DVT or because of DVT, nor did she mention that she had a problem with her legs or difficulty lifting them. (Young Dep. 24:12-23.) Similarly, Thomas testified that the plaintiff never mentioned problems with the strength in her legs. (Thomas Dep. 23:2-9.) Daughtry did not recall the plaintiff telling him about any pain or nerve damage in her legs. (Daughtry Dep. 32:20-25.) Rogers testified that the plaintiff told him she was having "issues" getting into the train, but did not testify that the plaintiff told him about weakness, pain or nerve damage. (Rogers Dep. 12:20-13:8.)

The plaintiff testified that approximately two weeks into her training, she asked Thomas if she could use two hours of paid classroom training to learn how to get in and out of the train. (Pl.'s 56.1 Counter ¶¶ 44, 45; Jones Dep. 84:6-22.) Thomas denied the request. (Thomas Dep. 23:19-24:19.) According to Thomas, the plaintiff asked for tutoring for classroom work, not for help getting on the train. (*Id.*) Thomas denied the request because tutoring was reserved for probationary employees who were failing the classroom work; the plaintiff was not failing. (*Id.*) The plaintiff asked Rogers for help, and he showed her different ways to climb into the train and get out of it. (Jones Dep. 87:3-13; Rogers Dep. 11:18-13:8, 31:21-32:20.)

*6. The Plaintiff's Termination*

Less than a month into the plaintiff's probationary employment period, Leonard Young terminated her on January 17, 2017, effective January 21, 2017.[7]  (Pl.'s 56.1 Counter ¶ 37; ECF No. 37-10.)  The parties provide different accounts of what led to Young's decision to terminate the plaintiff.  (*See* Pl.'s 56.1 Counter ¶¶ 3, 31.)

According to Thomas, the plaintiff tried to climb into the R-68 model train, but could not.  (Thomas Dep. 39:17-41:5.)  Thomas encouraged her to keep trying, because "we did not want to see nobody fail."  (*Id.* at 40:9-19.)  At first, the plaintiff said, "Let me just catch my breath."  (*Id.*)  She tried again but did not follow through.  (*Id.*)  She said "she didn't want to do it."  (*Id.* at 40:25-41:5.)

Young testified that when the plaintiff could not get into the train, he asked Daughtry to demonstrate other techniques, which the plaintiff tried unsuccessfully to replicate.  (Young Dep. 25:21-26:10.)  The plaintiff asked for more time, so Young asked Daughtry to "go[] over the procedure with her."  (*Id.* at 26:11-27:9.)  At that point, the plaintiff said that she could not stay because she had to move her car.  (*Id.*)  Young agreed, and went back to the school.  (*Id.*)  Later, Daughtry told Young that the plaintiff "said she can't do it.  She can't climb onto the train."  (*Id.*)  Young decided to terminate the plaintiff because she could not climb into the R-68 model train from the tracks.[8]  (Pl.'s 56.1 Counter ¶ 32; Young Dep. 60:15-19.)  Young directed the plaintiff to report to 130 Livingston Street in Brooklyn the next day for termination processing.  (Pl.'s 56.1 Counter ¶ 32.)

---

[7] The parties agree that Young decided to terminate the plaintiff on January 17, 2017.  (Pl.'s 56.1 Counter ¶ 32.)  The plaintiff's termination letter is dated January 18, 2017.  (ECF No. 36-10.)

[8] The plaintiff agrees that she "had issues climbing onto . . . the R-68."  (ECF No. 34, Pl.'s 56.1 Statement ("Pl.'s 56.1") ¶ 8.)

According to the plaintiff, she was trying to climb into the train and fell, injuring her ankle. (Jones Dep. 113:7-115:13.) She claims that she did not try a second time. (*Id.*) She also maintains that Daughtry and Thomas saw her fall (*id.* at 115:20-24); Thomas and Daughtry, on the other hand, testified that she did not fall (Thomas Dep. 27:2-12; Daughtry Dep. 33:19-34:5). While the plaintiff concedes that Young did not see the fall, she maintains that he was "aware of the injury." (Jones Dep. 119:11-17.)

The next day, on January 18, 2017, the plaintiff reported to 130 Livingston Street and waited as directed, but the person she was told to see was not available, and she was directed to return the next day. (Pl.'s 56.1 Counter ¶ 33; Jones Dep. 119:18-120:11, 121:19-122:14.) On January 19, 2017, the plaintiff could not put pressure on her legs, so she called in sick. (Pl.'s 56.1 Counter ¶ 34; Jones Dep. 119:23-121:9.) After Young told her that he could not accept sick calls from people who were being terminated, she called the "sick desk;" they put her on Workers' Compensation and told her there should have been an Injury on Duty report written for her alleged January 17, 2017 injury. (*Id.*) Although Young did not know whether the plaintiff had fallen, he filled out a form based on what the plaintiff told him. (Young Dep. 40:6-41:25, 45:4-47:5.) According to the Workers' Compensation Board's Notice of Decision, dated October 24, 2017, the plaintiff sustained "a work related injury to the [right] ankle." (ECF No. 37-12.) She was still receiving workers' compensation payments at the time of her deposition. (Jones Dep. 164:25-165:2.)

## LEGAL STANDARD

Summary judgment is appropriate only if the parties' submissions, including deposition transcripts, affidavits or other documentation, show that there is "no genuine dispute as to any material fact," and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a);

*see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The movant has the

burden of showing the absence of any genuine dispute as to a material fact. *McLee v. Chrysler*

*Corp.*, 109 F.3d 130, 134 (2d Cir. 1997) (citation omitted). A fact is "material" when it "might

affect the outcome of the suit under the governing law," and an issue of fact is "genuine" if "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Barlow*

*v. Male Geneva Police Officer Who Arrested Me on Jan. 2005*, 434 F. App'x 22, 25 (2d Cir.

2011) (internal citations omitted). Once the moving party has met its burden, the party opposing

summary judgment must identify specific facts and affirmative evidence that contradict those

offered by the moving party to demonstrate that there is a genuine issue for trial. *Ethelberth v.*

*Choice Sec. Co.*, 91 F. Supp. 3d 339, 349 (E.D.N.Y. 2015) (citing *Celotex Corp. v. Catrett,* 477

U.S. 317, 324 (1986)).

## DISCUSSION

### I. Disability Discrimination Claims Under the ADA, NYSHRL and NYCHRL

#### a. *Discrimination Under the ADA*

The ADA prohibits an employer from discriminating against a qualified employee on the

basis of disability. 42 U.S.C. § 12112(a). Discrimination claims under the ADA are analyzed

under the burden-shifting framework established by the Supreme Court in *McDonnell Douglas*

*Corp. v. Green*, 411 U.S. 792 (1973). *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir.

2006). Under this framework, the plaintiff "must first establish a *prima facie* case of

discrimination under the ADA." *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 71 (2d Cir. 2019).

She must show by a preponderance of the evidence that "(1) [her] employer is subject to the

ADA; (2) [s]he was disabled within the meaning of the ADA; (3) [s]he was otherwise qualified

to perform the essential functions of [her] job, with or without reasonable accommodation; and

(4) [s]he suffered adverse employment action because of [her] disability." *Id.* (quoting *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013)) (internal quotation marks omitted); *see also Sista*, 445 F.3d at 169.  Once a plaintiff meets this initial burden, "the burden of proof shifts to the defendant to 'articulate some legitimate, nondiscriminatory reason for the'" defendant's conduct.  *Fox*, 918 F.3d at 71 (quoting *McDonnell Douglas*, 411 U.S. at 802).  If the defendant meets its burden, the plaintiff must then "demonstrate that [the defendant's] assigned reason . . . was a pretext or discriminatory in its application."  *McDonnell Douglas*, 411 U.S. at 807.

The parties agree that termination is an adverse employment action, and that the defendant is subject to the ADA.  The defendant maintains that the plaintiff has not shown that she was actually disabled.  Under the ADA, the term "disability" means: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1); *see also Williams v. Geiger,* No. 18-CV-01398, 2020 WL 1304397, at *6 (S.D.N.Y. Mar. 19, 2020).  "For a plaintiff to establish that she has a disability under the statute's first subsection, she must (1) show that [she] suffers from a physical or mental impairment, (2) identify the activity claimed to be impaired and establish that it constitutes a major life activity, and (3) show that [her] impairment substantially limits the major life activity previously identified."  *Graham v. Three Vill. Cent. Sch. Dist.*, No. 11-CV-5182, 2013 WL 5445736, at *11 (E.D.N.Y. Sept. 30, 2013) (citation and internal quotation marks omitted).  The standard "'is not meant to be [ ] demanding,' and 'should not demand extensive analysis.'"  *Id.* at *12 (quoting 29 C.F.R. § 1630.2).  Performing manual tasks, walking, standing, lifting and bending are "major life activities."  42 U.S.C. § 12102(2)(A).  "Although almost every impairment may, of course, in some way affect a major life activity, the ADA clearly does not consider every impaired

person to be disabled." *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 160 (2d Cir. 2016) (quoting *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 870 (2d Cir. 1998)) (internal quotation marks omitted).

The evidence the plaintiff submits on her disability is sparse indeed. The only evidence other than her testimony is a vague four-sentence doctor's note, prepared long after she was terminated, and after she filed this lawsuit, and which says nothing about the plaintiff's condition in 2016 and 2017. There is no independent evidence, in the form of medical records or otherwise, about the plaintiff's condition when she was fired. Courts in this circuit "have imposed a requirement that, for a plaintiff to survive summary-judgment, she must supply more than her own deposition testimony, even if accompanied by unsworn medical evidence." *Amador v. Macy's E.-Herald Square*, No. 12-CV-4884, 2014 WL 5059799, at *11 n.12 (S.D.N.Y. Oct. 3, 2014); *see also Shomo v. Dep't of Corr. & Cmty. Supervision*, No. 15-CV-01029, 2019 WL 7971871, at *11 (N.D.N.Y. Oct. 7, 2019), *report and recommendation adopted*, 2020 WL 486868 (N.D.N.Y. Jan. 30, 2020) ("[A] person alleging a disability protected by the ADA has a burden of establishing with medical evidence the existence of the alleged disability. Summary judgment is appropriate when a plaintiff fails to produce such evidence.") (internal citations and quotations omitted); *Veldran v. Brennan*, 408 F. Supp. 3d 111, 116 n.5 (E.D.N.Y. 2019) ("Even if Plaintiff asserted the instant injury caused a substantial limitation on one or more major life activities, he has failed to point the Court to any medical testimony or any evidence to support such a position. His personal testimony, without more, is insufficient.").[9]

---

[9] While the plaintiff cites DVT as her disability, it is somewhat difficult to pin down precisely what it is that the DVT prevented her from doing. At points in the record, she seems to say that it kept her from getting into a particular train, the R-68. (*See* Jones Dep. 146:17-20.) At other points, she suggests that she might have been able to get into the train with additional help, but that "we will never know" because a new injury—the ankle injury from the January 17, 2017 fall—has side-lined her. (*See* Jones Dep. 157:25-158:7, 160:7-17.) I assume the claimed disability to be DVT and its after effects.

The plaintiff testified that she has difficulty walking "long distances or on exertion," depending on the difficulty of the activity (Jones Dep. 40:16-42:5): she has to pace herself and cannot walk as fast as other people (*id.*); she can walk three to four blocks at a time, and can continue walking if she rests (*id.* at 63:25-64:12); she sometimes has pain in her knees when she climbs stairs (*id.* at 64:13-65:1); she has muscle pain and weakness in her legs if she climbs more than one flight of stairs, and when she walks three to four blocks (*id.* at 63:8-64:22, 68:1-18); and she would not be able to climb all the way to the top of the Statue of Liberty, but might be able to climb two flights without stopping (*id.* at 65:9-66:3). According to the 2019 letter from a doctor, the plaintiff "has a history of multiple DVT's [*sic*] in both legs. These DVT's [*sic*] can cause pain and swelling of the legs that makes [*sic*] it difficult for her to stand, climb and lift her body weight up." (ECF No. 37-1.)

Courts have found similar impairments insufficient to establish an ADA-qualifying disability. *See Amador*, 2014 WL 5059799, at *15 ("Walking is a major life activity under the ADA. Nevertheless, an inability to walk long distances or for extended periods of time does not constitute a substantial limitation on an individual's ability to walk.") (internal citations omitted); *Graham*, 2013 WL 5445736, at *15 (collecting cases, including *Moore v. J.B. Hunt Transp., Inc.*, 221 F.3d 944, 951–52 (7th Cir. 2000) (a physical ailment of arthritis, which limited the plaintiff's rate and pace of walking, was insufficient to rise to the level of an ADA-qualifying disability) and *Sussle v. Sirina Prot. Sys. Corp.*, 269 F. Supp. 2d 285, 312 (S.D.N.Y. 2003) ("[T]he inability to walk long distances or to climb stairs does not in itself substantially limit an individual's ability to perform a major life activity.") (internal quotations omitted)).

The parties also dispute whether the plaintiff was qualified for the position. To be qualified, a person must be able to perform the "essential functions" of her position, with or

without reasonable accommodation.  29 C.F.R. § 1630.2(m).  "Evidence of whether a particular function is essential includes, but is not limited to: (i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs."  29 C.F.R. § 1630.2(n)(3). "Courts 'must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position,' but 'no one listed factor will be dispositive.'" *Stevens v. Rite Aid Corp.*, 851 F.3d 224, 229 (2d Cir. 2017) (quoting *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 100 (2d Cir. 2003) and *Stone v. City of Mount Vernon*, 118 F.3d 92, 97 (2d Cir. 1997)).

There is ample evidence in the record that climbing in and out of the trains is an essential function of the train conductor position, and insufficient evidence to create a genuine dispute of material fact on this issue.  Young, Daughtry and Thomas all testified that conductors must be able to enter and exit the train in various situations, including emergency evacuations, putting a train in the storage yard and "retraining."  (Young Dep. 31:21-33:9; Daughtry Dep. 15:5-17:4, 22:2-23:12; Thomas Dep. 13:21-17:18.)  The Notice of Examination for the conductor position also alerts applicants that the position entails "ascending and descending from trains and catwalks to roadbeds."  (Pl.'s 56.1 Counter ¶ 10; ECF No. 32-11 at 2.)  Additionally, in order to complete training successfully, a probationary conductor must demonstrate that she can climb from the track into and out of a train car on every model train in the division.  (Pl.'s 56.1 Counter

¶ 15; Young Dep. 29:19-30:17.)  Employees must be able to meet the job requirements for safety reasons.  (Young Dep. 57:6-58:16.)

Citing the testimony of Thomas, Young and Daughtry, the plaintiff claims that "[c]limbing into trains from the ground is not an essential function of the job" because "[c]onductors very rarely have to climb onto the track bed" and "[o]nly unusual incidents require a conductor to ascend and descend the train."  (ECF No. 36 at 13-14.)  As discussed above, Thomas, Young and Daughtry testified that conductors must be able to enter and exit the train in various situations.  The fact that a conductor might not often be called upon to get in and out of the train, or that emergencies are rare, does not change the analysis.  *See, e.g., Shannon*, 332 F.3d at 103 ("Color differentiation is a qualification that NYCTA may properly deem essential for driving a bus because it conduces to the safety of passengers and because it serves to limit NYCTA's tort liability in situations where color-blindness might cause an accident as well as where it may be alleged to have done so.  No reasonable juror could find otherwise.") (citing *Stone*, 118 F.3d at 97 (a function may be essential because of the "consequences of not requiring [the employee] to perform the function")) (internal citations omitted).  NYCTA's determination that this function is essential is entitled to deference, particularly because it implicates safety concerns.  *See id.* ("NYCTA has a statutory responsibility to operate the transit system for the safety of the public[,] . . . [e]mployment decisions may be made in light of that public interest . . . [a]nd the medical qualifications at issue were designed to serve that interest. ") (internal citations and quotations omitted).

The parties agree that the plaintiff could not climb into the R-68 train and that she was terminated for this reason.  (Pl.'s 56.1 ¶ 8; Pl.'s 56.1 Counter ¶ 32; ECF No. 36 at 14-17.)  The plaintiff argues, however, that the defendant should have accommodated her by giving her

additional training or by making sure she did not work on R-68 trains. But she got extra help from Rogers and still could not manage the R-68. (Jones Dep. 87:3-13; Rogers Dep. 11:15-13:8, 31:21-32:20.) She also testified that she did not know if there was another technique that would have enabled her to climb into the R-68 train. (Jones Dep. 160:10-17.) As for the plaintiff's claim that the defendant should have permitted her to work on trains other than R-68 trains, Young testified that once an employee picks a subdivision, the employee could not be moved because of "a union issue." (Young Dep. 54:7-23.) Nor is the plaintiff helped by Thomas' testimony that the plaintiff could climb into all models in the B Division (Thomas Dep. 41:19-42:22); the plaintiff could not get into the R-68 train, which was a requirement of the job. Moreover, conductors are not guaranteed assignment to a specific train or line. (Thomas Dep. 36:22-37:20; Young Dep. 29:6-21, 31:5-18, 37:9-24.)

In any event, it is not necessary to decide whether the plaintiff was actually disabled, or whether she was qualified, because she has not shown that the defendant terminated her because of a disability. Establishing this element of a *prima facie* case "necessarily incorporates an inquiry as to whether the employer had notice of the plaintiff's disability." *McCoy v. Morningside at Home*, No. 11-CV-2575, 2014 WL 737364, at *4 (S.D.N.Y. Feb. 25, 2014), *aff'd*, 601 F. App'x 57 (2d Cir. 2015) (collecting cases). To establish causation, the plaintiff must show "that [her] disability was the but-for cause of the adverse employment action." *McCrain v. Metro. Transp. Auth.*, No. 17-CV-2520, 2020 WL 1285634, at *13 (S.D.N.Y. Mar. 18, 2020) (citing *Natofsky v. City of New York*, 921 F.3d 337, 349 (2d Cir. 2019) ("We conclude that 'on the basis of' in the ADA requires a but-for causation standard."), *petition for cert. docketed*, No. 19-732 (Dec. 10, 2019)).

The parties agree that the plaintiff was terminated because she could not climb aboard the R-68 model train from the tracks. (Pl.'s 56.1 Counter ¶ 32; Young Dep. 60:15-19.) The plaintiff says that the "sole reason" for her termination was "her inability to climb into a single train which she alleges is due to her disability," and that "[t]he sole question of fact remaining is whether Defendant was aware of her disability." (ECF No. 36 at 17.)

Of course, even if the defendant were aware that the plaintiff had a disability, mere knowledge would not necessarily show a causal link between the disability and her termination. In any case, the plaintiff has not established that the defendant knew she had a disability. Most significantly, the plaintiff did not inform the defendant that she had DVT or its after effects at the most logical time to do so—when she filled out her pre-employment health form. In that form the plaintiff had opportunities to apprise the defendant of her health conditions—there were questions about conditions that kept the plaintiff from "bending," "pulling," "standing," "lifting" or "pushing," as well as for the plaintiff to list any current medical problems or conditions not otherwise mentioned in the form. (ECF No. 32-12 at 6.) The plaintiff responded "yes" to a question that asked whether she was overweight, and listed diabetes as her only current medical problem. (*Id.* at 3, 6.) But she said nothing about DVT or its after effects.

Nor does the fact that the plaintiff told a nurse "about the Gabapentin for the muscles and nerves in [her] legs from the DVT"[10] (Pl.'s 56.1 Counter ¶ 26; Jones Dep. 139:16-145:11) constitute sufficient notice, especially since the plaintiff did not list DVT or any disabling limitations from DVT on her pre-employment health form (ECF No. 32-12). In *McCoy v. Morningside at Home*, McCoy accused her employer of firing her because of her disabilities— bipolar disorder and back problems. 2014 WL 737364, at *4. She claimed that she told a

---

[10] As noted above, this testimony is inconsistent with the plaintiff's testimony that she had not taken DVT-related medication since early 2016.

coordinator and supervising nurse that she had re-injured her back. *Id.* at *5. Shortly thereafter, she submitted a pre-employment health exam form in which she certified that she had no back problems or other health issues. *Id.* The court concluded that there was insufficient evidence that the defendants had notice that the plaintiff was disabled within the meaning of the ADA. *Id.*; *see also Williams v. N.Y.C. Dep't of Educ.*, No. 18-CV-11621, 2020 WL 906386, at *6 (S.D.N.Y. Feb. 25, 2020) (the plaintiff's complaint did not establish that her employer had notice that her condition was disabling even though the school nurse diagnosed her with "severe hypertension").

Similarly, the plaintiff's statements to various supervisors that she did not have the leg strength to reach the grab bars, that she had weakness in her legs, and damaged muscles and nerves (Jones Dep. at 110:13-25, 145:12-146:9, (Day 2) 35:7-17) do not establish that the defendant knew she had a disability. *See McCoy*, 2014 WL 737364, at *4 ("An employer's awareness that a plaintiff suffered some injury does not establish that an employer had notice that the plaintiff was disabled."); *Piccolo v. Wal-Mart*, No. 11-CV-406, 2012 WL 1965440, at *8 (W.D.N.Y. May 31, 2012) ("Plaintiff only informed Defendant that he was experiencing back and leg pain. This was not enough for Defendant to believe Plaintiff was disabled. Nor was Defendant required to accept Plaintiff's representation that he was suffering a relapse from the condition which had necessitated a 12-month leave of absence."); *Brown v. Connecticut*, No. 08-CV-1478, 2010 WL 2220580, at *17 (D. Conn. May 27, 2010) ("It is well established in the ADA context that an employer's knowledge of an employee's limitations or symptoms does not provide proof that the employer knew that the condition or symptoms were disabling."); *Williams v. N.Y.C. Dep't of Educ.*, 2020 WL 906386, at *6 (a teacher's allegations that the principle was aware of medical accommodations requested by her doctor, and that the school

nurse diagnosed her with severe hypertension, were insufficient to allege that the defendant was on notice "of any specific disability"). The plaintiff "never disclosed DVT" (Jones Dep. 110:13-18, 139:6-15, 146:10-12), and her statements to her supervisors did not provide notice that her condition was disabling within the meaning of the ADA.

In short, neither the plaintiff's comments to her supervisors that she had weakness in her legs or her statement to a nurse about the kind of medication she took create a genuine dispute of fact as to whether her employer had notice that she had a disabling condition.

b. *Discrimination Under the NYSHRL*

"New York State disability discrimination claims are governed by the same legal standards as federal ADA claims." *Stinnett v. Delta Air Lines, Inc.*, No. 19-CV-1098-CV, 2020 WL 1230802, at *2 (2d Cir. Mar. 13, 2020) (summary order) (quoting *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 117 n.1 (2d Cir. 2004)); *see also Wu v. Metro. Transp. Auth.*, No. 18-CV-6543, 2020 WL 615626, at *10 (S.D.N.Y. Feb. 7, 2020) (applying the same standard to ADA and NYSHRL discrimination claims). Accordingly, the plaintiff's NYSHRL disability discrimination claim is dismissed for the reasons stated above.

c. *Discrimination Under the NYCHRL*

"Although 'courts must analyze NYCHRL claims separately and independently from any federal and state law claims,' a plaintiff bringing a claim under the NYCHRL must still 'show[ ] that the conduct [complained of] is caused by a discriminatory motive.'" *Wu*, 2020 WL 615626, at *11 (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109-10 (2d Cir. 2013)). "The plaintiff must show that discrimination played a role in the employer's decision-making." *Id.* (citing *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 75-76 (2d Cir. 2015), *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 837 n.8 (S.D.N.Y. 2013) and *Philip v.*

*Gtech Corp.*, No. 14-CV-9261, 2016 WL 3959729, at *10 (S.D.N.Y. July 20, 2016) (holding that the federal, state, and city "statutory standards as to causation are coterminous")).  Because the plaintiff cannot show that discrimination played a role in her termination—or even that the defendant had knowledge of her disability when she was terminated—the plaintiff's NYCHRL claim for discriminatory termination is dismissed.

## II.     Failure to Accommodate Claims Under the ADA, NYSHRL and NYCHRL

### a.  *Failure to Accommodate Under the ADA*

To establish a *prima facie* case of discrimination based on a failure to accommodate, the plaintiff must show that "(1) [she] is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation, [she] could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 (2d Cir. 2006) (citation and quotation marks omitted).  "An employer may avoid liability by demonstrating that the requested accommodation would impose 'an undue hardship on the operation of [its] business.'" *Williams v. Geiger*, 2020 WL 1304397, at *6 (quoting 42 U.S.C. § 12112(b)(5)(A) and citing *Graves*, 457 F.3d at 184).

As discussed above, the plaintiff has not shown that the defendant had notice of her disability.  Because there is no genuine dispute of material fact as to this issue, the plaintiff's failure to accommodate claim cannot withstand summary judgment.

### b.  *Failure to Accommodate Under the NYSHRL and NYCHRL*

"Courts apply the same standard for failure to accommodate cases under the ADA, . . . NYSHRL, and NYCHRL." *Lawtone-Bowles v. City of New York*, 2019 WL 652593, at *6

(S.D.N.Y. Feb. 15, 2019). Accordingly, the plaintiff's claims based on a failure to accommodate under the NYSHRL and NYCHRL are also dismissed.

### III.    Retaliation Claims Under the ADA, NYSHRL and NYCHRL

The plaintiff confirms that she is not pursuing her retaliation claims. (ECF No. 36 at 18.) Accordingly, I dismiss these claims.

### IV.    The Plaintiff's Motion for Partial Summary Judgment

As discussed above, the plaintiff has not shown as a matter of law that she is disabled and that she could have performed the essential functions of her job. Accordingly, her motion for summary judgment is denied. In any case, because her claims cannot withstand the defendant's motion, her motion with respect to the elements of her claims is moot.

CONCLUSION

For the reasons stated above, I grant the defendant's motion to dismiss and deny the plaintiff's partial motion to dismiss.

**SO ORDERED.**

s/Ann M. Donnelly
_____
ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
        March 31, 2020